## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

RONALD BUCKLEY,

      Plaintiff,                                 Case No.
                                                 Hon.

CITY OF WESTLAND, a Michigan
Municipal Corporation, CHIEF JEFFREY
JEDRUSIK, in his official and individual capacity,
DEPUTY CHIEFBRIAN MILLER, in his official
and individual capacity, DEPUTY CHIEF
RANDAL THIVIERGE, in his official and
individual capacity, LT. JASON BLANCHARD,
in his official and individual capacity
SGT. JAMES STARKS, in his official and
individual capacity, OFFICER JASON
NEVILLE, in his official and individual capacity,
OFFICER JAMES COMPTON, in his official and
individual capacity, and OFFICER DEREK GOMEZ,
in his official and individual capacity,

      Defendants.

_____

## <u>COMPLAINT AND JURY DEMAND</u>

NOW COMES Plaintiff, Ronald Buckley, by and through his attorneys, Flood

Law PLLC and Teresa J. Gorman PLLC, and for his Complaint against the City of

Westland, Chief Jeffrey Jedrusik, Deputy Chief Brian Miller, Deputy Chief Randal

Thivierge, Lt. Jason Blanchard, Sgt. James Starks, Officer Jason Neville, Officer

James Compton, and Officer Derek Gomez, in their official and individual capacities

(collectively "Defendants"), states the following:

1

## INTRODUCTION

This is an action brought by Plaintiff, former Westland Police Sgt. Ronald Buckley, ("Sgt. Buckley"), a respected officer and long-standing pillar of the police force, in an effort to vindicate him for profound deprivations of his statutory and constitutional rights by Defendants and other parties who were acting with them and on their behalf.  Sgt. Buckley was wrongfully terminated after a 24-year career in civil service and maliciously prosecuted by his own Department in order to provide Defendants a necessary scapegoat and ease public pressure after a terrible tragedy at the Westland Jail.  While working in concert and in a conspiratorial manner, Defendants intentionally caused Sgt. Buckley to be prosecuted for serious charges and crimes that have since been rightfully dismissed.  Defendants' actions, thoroughly described in the following paragraphs, have caused immeasurable losses, both economic and noneconomic, to Sgt. Buckley, his wife, and his children.  For these reasons, Sgt. Buckley asks this Honorable Court to grant him judgment on the following claims and enter an award of damages more specifically described herein.

## JURISDICTION

1.     This is an action for deprivation of Plaintiff's rights under the United States Constitution, the Elliott-Larsen Civil Rights Act, M.C.L. § 37.2101 *et seq*., ("ELCRA"), the Persons With Disabilities Civil Rights Act, M.C.L. § 37.1201 *et*

*seq*., ("PDCRA"), and Michigan common-law, arising from Plaintiff's employment relationship with Defendant City of Westland.

2.     This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, and the Fourteenth Amendment to the United States Constitution. Jurisdiction is conferred upon this court by 28 U.S.C. §§ 1331and 1343, this being an action seeking redress for the violation of the Plaintiff's constitutional and civil rights.

3.     This Court also has supplemental jurisdiction under 28 U.S.C. § 1367(a), to hear and decide claims arising under state law that are so related to the claims within the original jurisdiction of this Court that they form part of the same case or controversy.

4.     The events giving rise to this cause of action occurred within the Eastern District of Michigan, and this matter is otherwise within this Court's jurisdiction.

5.     Venue is proper under 28 U.S.C. §1391(b) and (c), in that all parties are residents and/or administratively located within the Eastern District of Michigan, and the events giving rise to this claim occurred within the boundaries of the Eastern District of Michigan.

6.     At all times relevant to the instant suit, Plaintiff was Defendants' employee within the meaning of the ELCRA and the PDCRA.

7.     Defendants meet all of the requirements for employer status under the ELCRA and PDCRA.

8.     The amount in controversy exceeds $75,000.00, exclusive of interest, costs, and attorney fees.

9.     Plaintiffs' Complaint is timely filed within the applicable statutes of limitations.

10.    Defendants are not immune from suit under the Governmental Tort Liability Act, M.C.L. § 691.1401, *et seq*., or any other statute.

## **PARTIES**

11.    At all times relevant to this action, Plaintiff Ronald Buckley was a resident of Washtenaw County within the Eastern District of Michigan.

12.    Defendant City of Westland is a municipal entity existing under the laws of the State of Michigan and is located within the Eastern District of Michigan.

13.    Defendant Chief Jeffrey Jedrusik ("Chief Jedrusik"), during all relevant times, was the Chief of the City of Westland Police Department and resided within the Eastern District of Michigan.

14.    Defendant Chief Jedrusik is being sued in both his individual and official capacities.

15.     Defendant Deputy Chief Brian Miller ("Deputy Chief Miller"), during all relevant times, was a Deputy Chief of the City of Westland Police Department and resided within the Eastern District of Michigan.

16.     Defendant Deputy Chief Miller is being sued in both his individual and official capacities.

17.     Defendant Deputy Chief Randal Thivierge ("Deputy Chief Thivierge"), during all relevant times, was a Deputy Chief of the City of Westland Police Department and resided within the Eastern District of Michigan.

18.     Defendant Deputy Chief Thivierge is being sued in both his individual and official capacities.

19.     Defendant Lt. Jason Blanchard ("Lt. Blanchard"), during all relevant times, was a lieutenant of the City of Westland Police Department and resided within the Eastern District of Michigan.

20.     Defendant Lt. Blanchard is being sued in both his individual and official capacities.

21.     Defendant Sgt. James Starks ("Sgt. Starks"), during all relevant times, was a sergeant of the City of Westland Police Department and resided within the Eastern District of Michigan.

22.     Defendant Sgt. Starks is being sued in both his individual and official capacities.

23.     Defendant Officer Jason Neville ("Officer Neville"), during all relevant times, was an officer with the City of Westland Police Department and resided within the Eastern District of Michigan.

24.     Defendant Officer Neville is being sued in both his individual and official capacities.

25.     Defendant Officer James Compton ("Officer Compton"), during all relevant times, was an officer of the City of Westland Police Department and resided within the Eastern District of Michigan.

26.     Defendant Officer Compton is being sued in both his individual and official capacities.

27.     Defendant Officer Derek Gomez ("Officer Gomez"), during all relevant times, was an officer of the City of Westland Police Department and resided within the Eastern District of Michigan.

28.     Defendant Officer Gomez is being sued in both his individual and official capacities.

## GENERAL ALLEGATIONS

### *Sgt. Ronald Buckley*

29.     Sgt. Buckley realleges and hereby incorporates by reference the allegations contained in the previous and subsequent paragraphs.

30.     Sgt. Buckley, now 55 years old, began his career with the Westland Police Department as a Patrolman on August 28, 2000.

31.     Sgt. Buckley came to the Westland Police Department after obtaining an Associate's Degree in Liberal Arts from Schoolcraft College and serving for eight years with another department.

32.     Sgt. Buckley also holds a Police Academy Certification from the Wayne County Regional Police Academy at Schoolcraft College, which he obtained in 1991.

33.     Sgt. Buckley served as a patrolman for 12 years, from 2000 to 2012.

34.     Sgt. Buckley was promoted to Sergeant on September 17, 2012.

35.     During his 18-year career with the Westland Police Department, Sgt. Buckley received positive evaluations and regular raises.

36.     Sgt. Buckley is highly motivated and dedicated to service.  He has attended numerous trainings and programs, including, but not limited to:

- The Reid Technique of Investigative Interviewing & Advanced Interrogation – February, 2016;

- MCOLES Speed Measurement Operator Recertification – December, 2014;

- National Criminal Justice Crime Scene Phase I and Phase II – August, 2014;

- "Inside the Tape" Homicide Investigation and Crime Scene Management Training – March, 2014;

7

- Supervisor Leadership & Liability – February, 2013;

- The Reid Technique of Interviewing & Interrogation – August, 2013;

- MCOLES Basic Police Motorcycle Operation – May, 2008;

- Patrol / School response to Violence – February, 2000;

- Advanced High-Risk Felony Vehicle Stops – May, 1998;

- MSU School of Criminal Justice Community Policing Training – May, 1998;

- Oakland Police Academy P.R.I.D.E. – March, 1997;

- Schoolcraft College Deadly Force Decision Making – January, 1996;

- Laser Speed Enforcement Training – September, 1996;

- Washtenaw Community College FTO 40-Hour Basic Course – September, 1995;

- Wayne County Detectives Association Auto Theft Seminar – May, 1995;

- Wayne County Detectives Association Gang Seminar – May, 1993;

- Schoolcraft College Conflict Resolution in a Multi-Cultural Environment – July, 1993;

- Oakland Police Academy Basic Radar Course – December, 1992.

37.    During his years of service, Sgt. Buckley was honored with numerous commendations, certificates of merit and MADD / lifesaving awards for his outstanding service, dedication, and professionalism.

8

38.     Most recently, in May 2018, Sgt. Buckley was honored with a Unit Commendation and a Westland Police Department Life Saving Award, along with a Certificate of Recognition from Westland Mayor William Wild, for "diligence in responding to, investigating, and the prosecution of the subjects responsible for taking the lives of two citizens."

39.     During his employment with Defendant City of Westland, the terms of Sgt. Buckley's employment were set forth in and governed by Collective Bargaining Agreement with the Police Officers Association of Michigan ("POAM") and its affiliate, the Westland Police Officers Association.

### *Sgt. Buckley's History of Disabilities*

40.     Throughout the course of his employment with the Westland Police Department, Sgt. Buckley was faced with several disabilities (that may be suffered by any average aging individual) a severe work-related injury, and a bout with cancer — all of which were well known to Defendants.

41.     Sgt. Buckley has suffered from osteo-arthritis, asthma, irritable bowel syndrome, and Raynards syndrome for many years.

42.     Sgt. Buckley informed Defendants of his various health issues.

43.     Despite his conditions, Sgt. Buckley was able to fully perform all of his duties without need for accommodation.

44.     On December 3, 2002, Sgt. Buckley injured his back while he was loading his duty bag into his vehicle.

45.     Eight years later, on February 10, 2010, Sgt. Buckley suffered a fall while on a traffic stop, resulting in a ruptured spinal disc and fractured vertebrae in the L3-L4 area of his lumbar spine.

46.     Sgt. Buckley's back injury required spinal fusion surgery.

47.     Sgt. Buckley's physician informed him that while a small spinal fusion would grant immediate relief, Sgt. Buckley would ultimately require a larger spinal fusion surgery.

48.     Sgt. Buckley was informed that his worker's compensation insurance would not pay for preventive surgery, despite the fact that Sgt. Buckley's physician ruled a larger spinal fusion necessary.

49.     On March 3, 2010, Sgt. Buckley underwent lumbar fusion surgery as a result of his ongoing spinal issues.

50.     On May 20, 2013, Sgt. Buckley underwent resection surgery after a diagnosis of colorectal cancer.  His recovery required that he stay off work for three months.

51.     After Sgt. Buckley returned to work after his surgery, fully recovered, Defendant Deputy Chief Jeffrey Jedrusik, who was aware of Sgt. Buckley's

diagnosis and recovery, advised Sgt. Buckley that he was no longer permitted to use a specific restroom.

52.    Upon information and belief, Defendant Chief Jedrusik did not want to share a restroom with Sgt. Buckley because of Sgt. Buckley's diagnosis.

53.    Defendant Chief Jedrusik continued to permit all of Sgt. Buckley's coworkers to use the particular restroom.

54.    Defendant Deputy Chief Jeffrey Jedrusik's discriminatory action of singling out Sgt. Buckley, a cancer survivor, to ostracize from the rest of the department caused Sgt. Buckley to suffer anxiety and humiliation.

55.    Nevertheless, Sgt. Buckley remained dedicated to his position with the Westland Police Department, and he continued to serve as an exemplary officer.

56.    Five years after his spinal fusion surgery, Sgt. Buckley began suffering from lower back pain.

57.    Sgt. Buckley complained about this recurrent pain to Deputy Chief Brian Miller, who told Sgt. Buckley that he would look into getting Sgt. Buckley an evaluation.

58.    Shortly thereafter, representatives of Defendant City of Westland admitted that they made an error in failing to cover Sgt. Buckley's larger spinal fusion, and promised to pay for any necessary fusion surgery arising from Sgt. Buckley's 2002 workplace injury.

59.     In March, 2017, Sgt. Buckley complained to Defendant Chief Jedrusik, Defendant Deputy Chief Miller, and the Personnel Department, of pain in his lumbar area that had been ongoing from his 2010 injury, as well as additional pain that had radiated to his cervical spine.

60.     Sgt. Buckley, still in the Detective Unit, was told that due to his injury he would not have any contact with prisoners without another investigator present.

61.     Later that year, when Sgt. Buckley transferred to Road Patrol, his new supervisor did not continue the no contact with prisoners policy.

62.     Sgt. Buckley was scheduled to undergo cervical fusion surgery on December 4, 2017, but was forced to reschedule due to Defendants denying him time off from work during the holiday season.

63.     Although Sgt. Buckley finally underwent cervical fusion of his C5-C7 vertebrae on March 1, 2018, his surgery was again delayed after a tragic incident at the Westland Jail left Sgt. Buckley embroiled in a department-wide conspiracy that would ultimately result in his termination and a groundless prosecution.

### *The Death of Mr. Marshall at the Westland Jail*

64.     In the early morning hours of December 10, 2017, Westland Police Officers James Compton and Derek Gomez performed a traffic stop for a plate violation on a vehicle driven by William Marshall ("Mr. Marshall").

65.     When the officers approached the vehicle, they observed a marijuana cigarette behind Mr. Marshall's ear.

66.     During the traffic stop, or immediately prior, Mr. Marshall swallowed a small plastic baggie of cocaine.  Trace amounts of cocaine remaining on Mr. Marshall's lips/mouth were detected by Officers Compton and Gomez, who ultimately arrested Mr. Marshall for possession of narcotics.

67.     Officers Compton and Gomez recovered some of the cocaine from Mr. Marshall's lips/mouth and placed it in an evidence bag.

68.     In his own narrative report, Officer Compton states: "I then observed numerous small pieces of crack cocaine on Marshall's tong [sic], gums, and lips."

69.     Officers Compton and Gomez were well-aware that Mr. Marshall had ingested cocaine.  Dash-cam video captured Officers Compton and Gomez questioning Mr. Marshall numerous times about the cocaine he had just ingested, and telling him that he could die from ingesting cocaine.

70.     Westland Police Department Policy L:01, in effect on the date of Mr. Marshall's arrest, directs that

> [n]o prisoner shall be booked, or held for interrogation or other purposes, if the prisoner has injuries or illnesses that require hospitalization or emergency medical attention of a health care professional.  This includes obvious cases of injury or illness, as well as situations in which arrestees . . . suffer from extreme alcohol intoxication or possible drug overdose.

71.     According to the above policy, Officers Compton and Gomez had a direct obligation to immediately call EMTs to the scene or transport Mr. Marshall to the hospital.

72.     Officers Compton and Gomez, whose shift was nearly over, did not contact EMTs or transport Mr. Marshall to the hospital.

73.     Instead, in direct violation of department policy, Officers Gomez and Compton transported Mr. Marshall to the Westland Jail to be booked and held in a detox cell.

74.     Mr. Marshall entered the Westland Jail at 6:30 a.m.

75.     Neither Officer Compton nor Officer Gomez advised any Police Service Aid ("PSA") at the Westland Jail that Mr. Marshall had ingested cocaine.

76.     When Officers Compton and Gomez brought Mr. Marshall into the jail, Defendant Sgt. Starks was the on-duty shift commander.

77.     Because Mr. Marshall was brought in during a shift change, the incoming on-duty shift commander, Defendant Lt. Blanchard, was also present.

78.     Officers Compton and Gomez informed the night shift commander, Defendant Sgt. Starks, and the day shift commander, Defendant Lt. Blanchard, that Mr. Marshall may have consumed cocaine.

79.     Additionally, Sgt. Starks accessed the Courts and Law Enforcement Management System ("CLEMIS") to view Mr. Marshall's case report within minutes of Mr. Marshall's arrival at the Westland Jail.

80.     According to Deputy Chief Brian Miller, Shift Commanders Sgt. Starks and Lt. Blanchard shared the highest supervisory authority at the Westland Jail.

81.     Neither Defendant Sgt. Starks nor Defendant Lt. Blanchard called for paramedics or directed Officers Compton and Gomez to transport Mr. Marshall to a hospital.

82.     Defendant Sgt. Starks reviewed and approved the police reports documenting Mr. Marshall's arrest and subsequently assigned the case to Defendant Officer Neville in the Special Investigations Unit.

83.     Police Service Aid ("PSA") Bailey Flinchum completed the booking process for Mr. Marshall, who at no time indicated that he had taken and/or ingested drugs.

84.     Officers Gomez and Compton did not advise PSA Flinchum or the other on-duty PSA, Tyler Riblet, that Mr. Marshall had consumed cocaine.

85.     According to Deputy Chief Brian Miller, PSAs Riblet and Flinchum shared responsibility for Mr. Marshall's care while in the custody of the Westland Jail.

86.    Sgt. Buckley arrived at the Westland Jail for duty at about 6:30 a.m., but did not have contact with Mr. Marshall until about an hour later.

87.    Sgt. Mark Cholak, another shift supervisor that was scheduled to work with Sgt. Buckley that day, had taken the day off.  Sgt. Buckley was left covering what would typically be a two-man shift on his own.

88.    Neither Officer Compton nor Officer Gomez had any communication with Sgt. Buckley regarding Mr. Marshall's arrest or Mr. Marshall's ingestion of cocaine.

89.    Neither of the Shift Commanders, Defendant Sgt. Starks or Defendant Lt. Blanchard, had any communication with Sgt. Buckley regarding Mr. Marshall's arrest or Mr. Marshall's ingestion of cocaine.

90.    Sgt. Buckley did not have any information regarding the possibility that Mr. Marshall had ingested cocaine.  He therefore could not, and should not, have known that Mr. Marshall was under the influence of any substances or susceptible to drug overdose while housed at the Westland Jail.

91.    Mr. Marshall entered the detox cell and laid down on the floor at approximately 7:13 am.  He appeared to be talking to other inmates.

92.    Video recordings of the detox cell reveal that at 7:52 a.m., PSA Riblet opened the door of the detox cell to check on Mr. Marshall and found Mr. Marshall struggling on the floor, appearing to be in convulsions.

93.     At this time, Sgt. Buckley immediately commanded PSA Riblet to contact the Westland Fire Department/EMS.

94.     According to dispatch logs, EMTs were dispatched a minute after Sgt. Buckley learned of Mr. Marshall's condition, at 7:53 a.m.

95.     Sgt. Buckley checked Mr. Marshall's booking sheet, which was void of medical conditions and made no mention of Mr. Marshall's cocaine ingestion.

96.     Sgt. Buckley also informed the on-shift supervisor, Lt. Blanchard, of his concerns for Mr. Marshall and his call to the EMTs.

97.     Although Lt. Blanchard had knowledge that Mr. Marshall may have ingested cocaine, he did not share this information with either Sgt. Buckley or the EMTs.

98.     Emergency Medical Technicians ("EMT") Matthew Dicosola and Leah Maynard, a trainee, entered the Westland Jail at approximately 8:01 a.m.

99.     Both EMT Dicosola and EMT Maynard were sworn-in firefighters and licensed paramedics.

100.   Mr. Marshall told the paramedics that he was having a seizure but did not state that he had ingested cocaine.

101.   The EMTs did not take Mr. Marshall's vitals.  Instead, they repeatedly told Mr. Marshall that he was not having a seizure.

102.    The EMTs represented to Sgt. Buckley repeatedly that Mr. Marshall was not having a seizure.

103.    Sgt. Buckley asked the EMTs if they were going to take Mr. Marshall's vitals, to which EMT Dicosola responded, "we can check him if you want, but he's not having a seizure."

104.    EMT Dicosola told Sgt. Buckley that they could take Mr. Marshall to the hospital, but reiterated that Mr. Marshall was not having a seizure.

105.    According to department policy, the only person qualified to make the determination of whether transport of an inmate to a medical facility is necessary is an EMT or other emergency medical personnel.

106.    Sgt. Buckley has never taken an EMT course and is not an EMT or a paramedic.

107.    Additionally, in his many years of service, Sgt. Buckley had frequently witnessed inmates faking medical conditions in an attempt to hinder police and/or obtain transport to a medical facility.  He had no reason to doubt the EMTs when they told him that was what was occurring in Mr. Marshall's case.

108.    Sgt. Buckley rightfully deferred to the judgment of the EMTs.

109.    The EMTs exited the Westland Jail at approximately 8:10 a.m.

110.    After the EMTs left the jail, Mr. Marshall resumed his seat on the floor of the cell.

111.   At about 8:25 a.m., two PSAs entered the detox cell door and attempted to get Mr. Marshall to sit on the bench in the cell as opposed to the floor near the cell door.  Mr. Marshall resisted, and began clinging to the cell door.

112.   Upon information and belief, these two PSAs, PSA Summer Chalfin and PSA Kozak, had arrived at the Westland Jail to start their shifts at 8:00 a.m.

113.   After realizing that the PSAs could not close the door to the detox cell, Sgt. Buckley entered the detox cell and tried to move Mr. Marshall's hand from the door. Mr. Marshall clung to the door and then began grabbing at Sgt. Buckley's legs and feet.

114.   Sgt. Buckley put his hand onto Mr. Marshall's upper back area and carefully removed Mr. Marshall's hands and feet from his legs.

115.   Once Sgt. Buckley had moved Mr. Marshall a safe distance from the door, he removed his hands from Mr. Marshall's back.

116.   The entire interaction between Sgt. Buckley and Mr. Marshall lasted a total of 10 seconds.

117.   Sgt. Buckley used the appropriate amount of force during the interaction, and Mr. Marshall sustained no injuries.

118.   At approximately 8:33, Defendant Officer Jason Neville entered the detox cell and attempted to speak to Mr. Marshall.

119.    Mr. Marshall did not speak to Officer Neville or acknowledge him in any way.

120.    Defendant Officer Neville did not report any abnormal behavior by Mr. Marshall during their interaction.

121.    However, Officer Neville issued Mr. Marshall a ticket for cocaine possession at 9:10 a.m., having already read the arrest reports and tested the substance taken from Mr. Marshall's mouth earlier that day.  Officer Neville's notes indicated that Mr. Marshall had concealed cocaine in his mouth.

122.    Officer Neville did not inform Sgt. Buckley that he had issued a ticket, and did not indicate to Sgt. Buckley that Mr. Marshall had or may have ingested cocaine.

123.    Later, Sgt. Buckley observed Mr. Marshall in a resting state and summoned Officer Chad Bristol to check on Mr. Marshall's status.

124.    At approximately 9:29 a.m., Officer Bristol entered the detox cell to check Mr. Marshall's condition and discovered that Mr. Marshall was unresponsive and without a pulse.

125.    Sgt. Buckley immediately directed PSAs to call the EMTs back to the jail.

126.    Officer Bristol pulled Mr. Marshall from the cell block, attached a defibrillator and started performing chest compressions.

127.   The Westland Fire Department responded to the Westland Jail a second time at approximately 9:39 a.m.

128.   Mr. Marshall was transported to the hospital, where it was later discovered that he had ingested large amounts of cocaine.

129.   Mr. Marshall's cocaine overdose was fatal.   He was pronounced deceased upon his arrival at the hospital.

130.   Sgt. Buckley's actions in responding to Mr. Marshall's condition did not violate any policy or protocol of the Westland Police Department.

131.   Sgt. Buckley was never informed by anyone, and therefore had no knowledge, that Mr. Marshall had ingested cocaine prior to his arrest.

132.   By the time that Mr. Marshall arrived at the Westland Jail, no action by Sgt. Buckley could have saved his life.

133.   According to medical professionals, the only opportunity to save Mr. Marshall's life was provided to the arresting officers.   Mr. Marshall would have to have been transported to the hospital as soon as possible after his ingestion of cocaine.

134.   Video and testimonial evidence proves that Sgt. Buckley twice requested medical assistance for Mr. Marshall while Mr. Marshall was in lockup.

135.  Mr. Marshall's death grabbed media attention and understandably spurred public outrage.  Defendants and the Wayne County Prosecutor's Office needed an urgent response.

136.  The Wayne County Prosecutor's Office immediately announced that it would conduct a criminal investigation.

137.  On or about May 11, 2018, before any internal investigation had been completed or a lawsuit filed, Defendant City of Westland paid to Mr. Marshall's family $3.75 million in damages.

### *The Conspiracy to Implicate Sgt. Buckley*

138.  The incident involving Mr. Marshall's death occurred on December 10, 2017.

139.  For the ensuing ten months, but for a three-month medical leave commencing in March 2018 for the scheduled spinal fusion, Sgt. Buckley performed his usual duties in his usual manner.

140.  Sgt. Buckley was not reprimanded, cited, suspended, or otherwise disciplined for any actions he took on the day of Mr. Marshall's death.

141.  However, sometime shortly after Mr. Marshall's death, Defendants began crafting their narrative.

142.  Defendants made the decision to pin responsibility for Mr. Marshall's death on Sgt. Buckley, who was the oldest officer present during the incident

involving Mr. Marshall (and the closest to retirement age), and an individual suffering from known disabilities.

143.   In February 2018, the City of Westland entered into a signed agreement with the Westland Lieutenants and Sergeants Association (a division of POAM) and Sgt. Buckley to postpone any internal investigation while the Wayne County Prosecutor's Office, assisted by the Michigan State Police ("MSP"), conducted its criminal investigation.

144.   In direct violation of the aforementioned agreement, on May 1, 2018, Defendants conducted an interview of PSA Summer Chalfin in connection with the death of Mr. Marshall.

145.   As MSP conducted its criminal investigation, the individual Defendants conspired to place the blame for Mr. Marshall's death on Sgt. Buckley.

146.   The conspirators' fabricated story was detailed in the Notice of Disciplinary Action signed by Defendant Chief Jedrusik and Deputy Chief Thivierge and ultimately issued to Sgt. Buckley on October 4, 2018, which reads:

> On 12/10/17, you were the on-duty Sergeant and had contact with a prisoner who had been arrested for a drug crime, reference case #170036182, and who later died while in custody, reference case #170036187.
>
> You had direct contact with the prisoner on multiple occasions who was asking for medical attention, but you believed that he was "faking seizures" and therefore delayed getting him checked by medical personnel.  Once the WLFD was called to check on the prisoner you advised them that the prisoner was faking and just wanted to get

attention.  You then allowed the prisoner to be placed back in lock-up without treatment and still being unclear on his medical condition thereafter.  The prisoner's action displayed an obvious and continuing need for medical attention which you failed to provide.  You neglected, or was inattentive, to this information as the case report states that the prisoner was observed with "small pieces of cocaine" on his tongue when he was arrested.

While dealing with the prisoner, you failed to act professionally as it was apparent that you lost your patience and were angered by the prisoner when you forcefully dragged him back into lock-up.  You acted in an insolent manner while dealing with the prisoner.  Your conduct did not reflect in a favorable manner on the department as you failed to treat the prisoner in accordance with department policy.  You failed to take appropriate actions when dealing with the situation which could be directly related to the death of the prisoner.  In addition, your actions constitute incompetency, inefficiency, neglect of duty, failure of good behavior, and nonfeasance in office, as proscribed by Act 78 of 1935, as amended, MCL 38.514(1).

147.   Each individual Defendant knew, throughout the entire course of the criminal investigation, that the statements and conclusions contained within the Notice of Disciplinary Action are false and unsupported by the evidence.

148.   Each of the individual Defendants had the opportunity to review the relevant video recordings and to read the relevant reports.

149.   Defendants furthered their conspiracy by lying under oath in depositions, modifying earlier filed police reports, and otherwise presenting false information to the Wayne County Prosecutors Office in order to support their own narrative.

150.   It worked.  On October 1, 2018, Wayne County Prosecutors charged Sgt. Buckley with one count of involuntary manslaughter, MCL 750.321, for the death of Mr. Marshall, as well as one count of misconduct in office, MCL 750.505.

151.   At the time, no internal investigation had been completed and Sgt. Buckley had not been informed that the Department planned to issue the notice of disciplinary action cited above.

152.   Sgt. Buckley, a 24-year veteran police officer, learned of the criminal charges when they were reported in the press on television.

153.   Reporters and onlookers began showing up to Sgt. Buckley's home, harassing Sgt. Buckley and his family and terrifying his young daughter.

154.   Sgt. Buckley pleaded not guilty to all pending charges.

### *Internal Investigation and Termination*

155.   Defendant Deputy Chief Thivierge led the internal investigation of Mr. Marshall's death.

156.   On October 2, 2018, Sgt. Buckley, Defendant Officer Neville, and Officer Chad Bristol were interviewed as part of Defendants' internal investigation.

157.   Sgt. Buckley, scared and confused, contacted his union representative, who informed Sgt. Buckley that the department wanted to terminate him.  Sgt. Buckley had the impression that he was being pressured into retirement.

158.   Sgt. Buckley had no plans to retire, and declined to do so.

159.   On October 4, 2018, Sgt. Buckley was terminated from his position with the Westland Police Department.

160.   That day, Defendant Chief Jedrusik sent out a department-wide email announcing that

> "the Westland Police Department completed its internal investigation regarding Sergeant Ronald Buckley's involvement in the prisoner incarceration incident which ultimately resulted in the death of William Marshall . . .  The investigation revealed that Sergeant Buckley violated policies and procedures of the Westland Police Department.  As a result of these police violations the employment of Ronald Buckley has been terminated."

161.   Sgt. Buckley's termination occurred more than 10 months after the Marshall incident, and at no time up to his termination had Defendants suggested that Sgt. Buckley had violated any policies and procedures.

162.   Sgt. Buckley had never been placed on administrative leave, had never been asked to attend a sensitivity course, and was not progressively disciplined for any actions taken during the Marshall incident.

163.   Sgt. Buckley was shocked, as his termination was an extreme departure from Defendants' history of officer discipline.

164.   When Sgt. Buckley's termination from the Westland Police Department was announced, Defendants, through their agents, employees and/or representatives, also falsely informed the media that their internal investigation had

been completed and had revealed that Sgt. Buckley had violated policies and procedures in the handling of Mr. Marshall.

165.   The Department's internal investigation had barely begun.

166.   At least five Westland Police Officers were on notice that Mr. Marshall had ingested cocaine before his arrest—Officer Derek Gomez, Officer James Compton, Defendant Sgt. Starks, Defendant Lt. Blanchard, and Defendant Officer Neville.   Only one of these men, Defendant Sgt. Neville, was interviewed in the internal investigation prior to Sgt. Buckley's termination.

167.   On October 11, 2018, Sgt. Buckley's union representative from the Police Officer's Association of Michigan ("POAM"), submitted a grievance against Defendants on his behalf, arguing that Sgt. Buckley's termination "is in violation of the collective bargaining agreement, Article 4, section 4.1 and Article 26, section 26.12, due to the absence of just cause for the termination."

168.   According to the official grievance, Sgt. Buckley's "actions comported with the Department Rules and Regulations as well as the accepted practices and levels of training provided by the Department.   In addition, the discipline violates progressive and corrective disciplinary standards applicable to the grievant's length of service (24+ years) and work record."

169.   Defendants were undeterred.

170. When the internal investigation was conducted, it was blatantly violative of department policy.

171. On-shift supervisors on the day of Mr. Marshall's death were not interviewed until October 30, 2018—nearly a month after Sgt. Buckley's termination.

172. PSA Bailey Flinchum was not interviewed until November 5, 2018, and PSA Elizah Kozak was not interviewed until December 9, 2018.

173. Officers Compton and Gomez were not interviewed until November 6, 2018.

174. During his November 6, 2018 interview, Officer Compton confirmed to Defendant Thivierge that he had informed both Sgt. Starks and Lt. Blanchard on the morning of Mr. Marshall's death that Mr. Marshall may have ingested cocaine.

175. Of the five officers aware of Mr. Marshall's cocaine ingestion—Officer Derek Gomez, Officer James Compton, Defendant Sgt. Starks, Defendant Lt. Blanchard, and Defendant Officer Neville—not one was disciplined for the circumstances surrounding Mr. Marshall's death and not one was criminally charged in connection with Mr. Marshall's death.

176. Notably, it was determined during the course of the investigation that Defendant Officer Neville had not only voided the ticket he issued Mr. Marshall for

possession of cocaine after Mr. Marshall's death, but he had altered his investigative report regarding his contact with Mr. Marshall in the detox cell.

177.   Defendants attempted to cover up Officer Neville's falsification in order maintain their "case" against Sgt. Buckley.

178.   Deputy Chief Miller later acknowledged that during the investigation, it was clear that Officers Compton, Gomez, and Neville all had direct knowledge of Mr. Marshall's cocaine consumption prior to his death.

179.   Officers Compton, Gomez, and Neville were not issued reprimands or citations by the Department, and were never the subject of investigation or charges by Defendants or the Wayne County Prosecutor.

180.   Shift Supervisors Sgt. Starks and Lt. Blanchard, who had ultimate authority and responsibility for Mr. Marshall's care while in custody, were not issued reprimands or citations by the Department, and were never the subject of investigation or charges by Defendants or the Wayne County Prosecutor.

181.   Despite knowing of Mr. Marshall's cocaine ingestion and Sgt. Buckley's innocence of any wrongdoing, none of the Defendants intervened on Sgt. Buckley's behalf or testified or otherwise asserted Sgt. Buckley's innocence.

182.   Rather, the targeted investigation of Sgt. Buckley, who had neither knowledge of Mr. Marshall's cocaine consumption on December 10, 2017, nor ultimate authority over his care while in custody, continued.

183.   Defendants made the decision that, rather than hold anyone else at all accountable, Defendants would make Sgt. Buckley the scapegoat.

184.   Although each witness was permitted to review pertinent materials before his or her interview, Sgt. Buckley was not afforded the same opportunity.

185.   Defendants intentionally and maliciously withheld exculpatory testimony and conspired to ensure that the blame for Mr. Marshall's death would be placed solely on Sgt. Buckley's shoulders.

186.   Defendants are considerably younger than Sgt. Buckley.

187.   Defendant City of Westland, by and through its officers, representatives, and employees, thereby treated Sgt. Buckley differently from similarly situated younger employees in the terms and conditions of employment, based on unlawful consideration of age.

188.   The Michigan State Police investigation ultimately concluded with findings that Sgt. Buckley had not violated any policies or procedures of the Westland Police Department, or state law, during the Marshall incident.

189.   Michigan State Police investigators specifically recommended that no charges against Sgt. Buckley were warranted, and that the case should be dropped.

190.   When the Michigan State Police communicated their findings and conclusion to the Wayne County Prosecutor's Office, the office refused to dismiss

the pending criminal charges. This decision was based on the false and incomplete information provided to them by Defendants.

### *Effect of Wrongful Termination on Sgt. Buckley and His Family*

191.   After his wrongful termination and Defendants' defamatory comments to the media, Sgt. Buckley and his family immediately began to suffer from fear, harassment, anxiety and depression.

192.   Media journalists began appearing at his home, placing his youngest child in fear and causing Sgt. Buckley and his wife to suffer from harassment and humiliation.

193.   Sgt. Buckley's two oldest children, who were both college students, faced depression, anxiety, and suffering academic performance.

194.   Sgt. Buckley's daughter, a senior in high school, was bullied and ridiculed by other students to the point that she started eating lunch in the school office every day alone.

195.   Sgt.   Buckley's   termination   and   Defendants'   intentional mischaracterization of Sgt. Buckley's responsibility resulted in Sgt. Buckley's family suffering incomprehensible pain, suffering, humiliation, and fear. Unfortunately, the Buckley family's battle wasn't over yet.

### *Criminal Proceedings and Acquittal*

196.   The preliminary examination on charges of manslaughter and misconduct in office against Sgt. Buckley and two codefendants—EMTs Leah Maynard and Matthew Dicosola—took place on December 17, 2018 and December 18, 2018 before the Honorable Mark Plawecki.

197.   Manslaughter charges against all three codefendants were dismissed as without probable cause on January 22, 2019.

198.   None of the other five officers present at the Westland Jail during the incident leading up to Mr. Marshall's death testified at Sgt. Buckley's criminal trial. These officers asserted their Fifth Amendment privilege against self-incrimination.

199.   During the criminal investigation and trial, a number of facts were uncovered that directly contradicted the prosecution's theory and the suggestion that Sgt. Buckley was in any way to blame for the death of Mr. Marshall, including, but not limited to:

   a.   Sgt. Buckley was not the ranking officer at the Westland Jail, and could not be liable in his supervisory capacity; and

   b.   EMTs Dicosola and Maynard were solely responsible for the delay in seeking appropriate medical intervention for Mr. Marshall, as it was ultimately up to them to decide whether Mr. Marshall should have been transported, treated on scene, or left in the cell.

200.   During the proceedings, City of Westland Fire Chief Michael Stradtner testified under oath that Sgt. Buckley did not violate any policies or procedures in his handling of the Marshall incident.

201.   On November 1, 2019, the jury found Sgt. Buckley not guilty of misconduct in office.

### Sgt. Buckley and His Family Are Still Suffering from the Effects of Defendants' Actions

202.   The public is now painfully aware of what Sgt. Buckley has known from the beginning —that Defendants' decision to terminate Sgt. Buckley was borne out of discrimination and conspiracy rather than truth.

203.   Despite the involvement of highly culpable officers, Defendants chose to put forth Sgt. Buckley, a man of comparatively advanced age with disabilities, as their convenient scapegoat and in order to avoid public backlash.

204.   Sgt. Buckley and his family have suffered immeasurable emotional and reputational damage as a direct and proximate result of Defendants' wrongful actions.

205.   Sgt. Buckley has been under the care of a psychologist and a psychiatrist since the onset of this incident, and continues to see them on a regular basis for stress, anxiety, PTSD and depression.

206.   Although Sgt. Buckley was just ten months short of retirement with a full pension when he was terminated, Sgt. Buckley had no plans of retiring.

207.   Sgt. Buckley has made every effort to mitigate the losses he suffered, both economic and noneconomic, as a result of Defendants' actions.

208.   Sgt. Buckley has applied and/or interviewed for at least 17 different law enforcement and/or security positions.  Despite his previously sterling qualifications, and a not guilty verdict, he has not been offered a single position.

## COUNT I
## DUE PROCESS VIOLATIONS UNDER 42 U.S.C. § 1983
## DEPRIVATION OF RIGHT TO FAIR TRIAL

209.   Sgt. Buckley realleges and hereby incorporates by reference the allegations contained in the previous and subsequent paragraphs.

210.   As described more fully above, all of the Defendants, while acting individually, jointly, and in conspiracy, as well as under color of law and within the scope of their employment, deprived Sgt. Buckley of his constitutional right to a fair trial.

211.   In the manner described more fully above, Defendants deliberately withheld exculpatory evidence, as well as fabricated false reports and provided false sworn testimony, thereby misleading and misdirecting the criminal prosecution of Sgt. Buckley.  Absent this misconduct, the prosecution of Sgt. Buckley could not and would not have been pursued.

212.   As a result of this violation of Sgt. Buckley's right to a fair trial, Sgt. Buckley suffered injuries, including, but not limited to, emotional distress.

213.   This misconduct was undertaken with malice, willfulness, and reckless indifference to Sgt. Buckley's rights.

214.   This misconduct was undertaken pursuant to the policy and practice of the City of Westland Police Department.

215.   As a direct and proximate result of Defendants' wrongful acts and omissions, Plaintiff has sustained loss of earnings, earning capacity, and fringe benefits and has suffered mental anguish, physical and emotional distress, humiliation and embarrassment.

## COUNT II
## DUE PROCESS VIOLATIONS UNDER 42 U.S.C. § 1983
## FAILURE TO INTERVENE

216.   Sgt. Buckley realleges and hereby incorporates by reference the allegations contained in the previous and subsequent paragraphs.

217.   In the manner described above, during the constitutional violations described above, one or more of the Defendants stood by without intervening to prevent the misconduct.

218.   As a result of the Defendant officers' failure to intervene to prevent the violation of Plaintiff's constitutional rights, Sgt. Buckley suffered pain and injury, as well as emotional distress.

219.   Defendants had a reasonable opportunity to prevent this harm, but failed to do so.

220.   This misconduct was undertaken with malice, willfulness, and reckless indifference to Sgt. Buckley's rights.

221.   This misconduct was undertaken pursuant to the policy and practice of the City of Westland Police Department.

222.   As a direct and proximate result of Defendants' wrongful acts and omissions, Plaintiff has sustained loss of earnings, earning capacity, and fringe benefits and has suffered mental anguish, physical and emotional distress, humiliation and embarrassment.

**COUNT III**
**VIOLATION OF CIVIL RIGHTS**
**PURSUANT TO TITLE 42 U.S.C. § 1983**
**<u>MALICIOUS PROSECUTION</u>**

223.   Sgt. Buckley realleges and hereby incorporates by reference the allegations contained in the previous and subsequent paragraphs.

224.   As described more fully above, Defendants, all while acting individually, jointly, and in conspiracy, caused Sgt. Buckley to be improperly subjected to judicial proceedings for which there was no probable cause.

225.   Sgt. Buckley's arrest was without probable cause or arguable probable cause and in violation of the Fourth and Fourteenth Amendment prohibition against unreasonable search and seizure.

226.   The judicial proceedings against Sgt. Buckley were instituted and continued maliciously, resulting in injury to Sgt. Buckley.

227.   All such proceedings were terminated in Sgt. Buckley's favor in a manner indicative of innocence.

228.   Defendants, all while acting individually, jointly, and in conspiracy, accused Sgt. Buckley of criminal activity knowing these accusations to be without probable cause, and they made statements to prosecutors with the intent of exerting influence to institute and continue the judicial proceedings.

229.   Statements of Defendants regarding Sgt. Buckley's alleged culpability were made with knowledge that said statements were false and/or perjured.  In so doing, Defendants fabricated evidence and withheld exculpatory information.

230.   The misconduct described in this Count III was undertaken with malice, willfulness, and reckless indifference to the rights of others.

231.   The misconduct was undertaken pursuant to the policy and practice of the City of Westland Police Department.

232.   As a direct and proximate result of Defendants' wrongful acts and omissions, Plaintiff has sustained loss of earnings, earning capacity, and fringe benefits and has suffered mental anguish, physical and emotional distress, humiliation and embarrassment.

## COUNT IV
## VIOLATION OF CIVIL RIGHTS
## PURSUANT TO TITLE 42 U.S.C. § 1983
## <u>DENIAL OF EQUAL PROTECTION UNDER THE 14TH AMENDMENT</u>

233.  Sgt. Buckley realleges and hereby incorporates by reference the allegations contained in the previous and subsequent paragraphs.

234.  As described more fully above, Defendants, all while acting individually, jointly, and in conspiracy, as well as under color of law and within the scope of their employment, denied Sgt. Buckley equal protection of the law in violation of his Constitutional rights.

235.  Specifically, these Defendants actively participated in, or personally caused, misconduct in terms of conspiring to subject Sgt. Buckley to arrest, criminal prosecution and termination from employment.  Said misconduct was motivated by age and disability animus and constituted purposeful discrimination.

236.  Defendants' discriminatory actions constitute a violation of Sgt. Buckley's rights to equal protection of the laws as secured by the 14th Amendment to the United States Constitution.

237.  Defendants violated Sgt. Buckley's federal constitutional rights secured by the 14th Amendment to be free from discrimination as a result of his disabilities.

238.  Defendants violated Sgt. Buckley's federal constitutional rights secured by the 14th Amendment to be free from discrimination as a result of his age.

239.  Defendant City of Westland is liable for the violations of Sgt. Buckley's federal constitutional rights pursuant to 42 U.S.C. § 1983 in failing to provide proper supervision and training to prevent this type of unlawful, discriminatory abuse.

240.   The misconduct was objectively unreasonable and was undertaken intentionally with willful indifference to Sgt. Buckley's constitutional rights.

241.   The misconduct described was undertaken pursuant to the policy and practice of the City of Westland Police Department.

242.   As a direct and proximate result of Defendants' wrongful acts and omissions, Plaintiff has sustained loss of earnings, earning capacity, and fringe benefits and has suffered mental anguish, physical and emotional distress, humiliation and embarrassment.

**COUNT V**
**CONSPIRACY IN VIOLATION OF 42 U.S.C. § 1985(3)**

243.   Sgt. Buckley realleges and hereby incorporates by reference the allegations contained in the previous and subsequent paragraphs.

244.   As described more fully above, each of the individual Defendants conspired, directly or indirectly, for the purpose of depriving Plaintiff of Equal Protection of the law.

245.   In so doing, Defendants took actions in furtherance of this conspiracy, causing injury to Sgt. Buckley.

246.   This misconduct was undertaken with malice, willfulness, and reckless indifference to Sgt. Buckley's rights.

247.   This misconduct was undertaken pursuant to the policy and practice of the City of Westland Police Department.

248.   As a direct and proximate result of Defendants' wrongful acts and omissions, Plaintiff has sustained loss of earnings, earning capacity, and fringe benefits and has suffered mental anguish, physical and emotional distress, humiliation and embarrassment.

## COUNT VI
## CONSPIRACY IN VIOLATION OF 42 U.S.C. § 1983

249.   Sgt. Buckley realleges and hereby incorporates by reference the allegations contained in the previous and subsequent paragraphs.

250.   After Mr. Marshall's death, Defendants reached an agreement amongst themselves to frame Sgt. Buckley for the death, to thereby deprive Sgt. Buckley of his constitutional rights.

251.   Independently, before and after Sgt. Buckley's arrest and preliminary hearing, Defendants further conspired to deprive Sgt. Buckley of exculpatory testimony and truthful information to which he was lawfully entitled and which would have led to a more timely exoneration of the false charges against him.

252.   In this manner, Defendants conspired by concerted action to accomplish an unlawful purpose by unlawful means.

253.   In furtherance of the conspiracy, the co-conspirators committed overt acts and were otherwise willful participants in the joint activity.

254.   This misconduct was undertaken with malice, willfulness, and reckless indifference to Sgt. Buckley's rights.

40

255.   This misconduct was undertaken pursuant to the policy and practice of the City of Westland Police Department.

256.   As a direct and proximate result of Defendants' wrongful acts and omissions, Plaintiff has sustained loss of earnings, earning capacity, and fringe benefits and has suffered mental anguish, physical and emotional distress, humiliation and embarrassment.

**COUNT VII**
**AGE DISCRIMINATION**
**IN VIOLATION OF THE ELLIOTT-LARSEN CIVIL RIGHTS ACT**

257.   Sgt. Buckley realleges and hereby incorporates by reference the allegations contained in the previous and subsequent paragraphs.

258.   As employers within the meaning of the Elliott-Larsen Civil Rights Act, M.C.L. § 37.2101 *et seq*. ("ELCRA"), Defendants owed Sgt. Buckley a duty not to discriminate against him with respect to employment, compensation, or other conditions or privileges of employment on the basis of his age.

259.   Sgt. Buckley was the second oldest employee of the Westland Police Department at the time of his termination and the oldest on-duty officer on the day of the Marshall Incident.

260.   During Sgt. Buckley's employment with the City of Westland and the Westland Police Department, Defendants, through their employees, agents, and

representatives, intentionally discriminated against Sgt. Buckley in the terms and condition of employment based on unlawful consideration of age.

261.   During Sgt. Buckley's employment with the City of Westland and the Westland Police Department, Defendants, through their employees, agents, and representatives, treated Sgt. Buckley differently from similarly-situated younger employees in the terms and conditions of employment, specifically, and without limitation, in terminating Sgt. Buckley for alleged conduct that should have been alleged against younger officers.

262.   Sgt. Buckley was replaced by a younger man.

263.   Sgt. Buckley was subjected to age discrimination by Defendants, by and through their employees, agents, and representatives, said acts being made unlawful by the ELCRA.

264.   Defendants, by and through their employees, agents, and representatives, violated the ELCRA by the following acts:

   a.   Failing to provide a work environment free from age discrimination;

   b.   Limiting, segregating, or classifying Sgt. Buckley in ways which deprived or tended to deprive Sgt. Buckley of employment opportunities or otherwise adversely affecting the status of Sgt. Buckley because of his race; and

c.    Terminating Sgt. Buckley and/or otherwise discriminating against Sgt. Buckley with respect to his employment, compensation, or a term, condition or privilege of employment, because of, in part, his age.

265.    Defendants, by and through their employees, agents, and representatives, were predisposed to discriminate on the basis of age and acted in accordance with that predisposition.

266.    Defendants' actions were intentional and with reckless indifference to Sgt. Buckley's rights and sensibilities.

267.    If Sgt. Buckley had been younger than or as young as the other involved officers, he would not have been treated in the manner recounted above.

268.    As a direct and proximate result of Defendants' wrongful acts and omissions, Plaintiff has sustained loss of earnings, earning capacity, and fringe benefits and has suffered mental anguish, physical and emotional distress, humiliation and embarrassment.

**COUNT VIII**
**DISCRIMINATION IN VIOLATION OF**
**THE PERSONS WITH DISABILITIES CIVIL RIGHTS ACT**

269.    Sgt. Buckley realleges and hereby incorporates by reference the allegations contained in the previous and subsequent paragraphs.

270.    As employers within the meaning of the Persons with Disabilities Civil Rights Act, MCL 37.1201 *et seq*. ("PDCRA"), Defendants owed Sgt. Buckley a duty

not to discriminate against him with respect to employment, compensation, or other conditions or privileges of employment on the basis of disability.

271.  At all relevant times, Sgt. Buckley was an individual with disabilities within the meaning of the PDCRA.  Specifically, Sgt. Buckley has physical impairments that substantially limits one or more of his major life activities, has a record of the impairments and/or is regarded by Defendants as having the impairments.

272.  During Sgt. Buckley's employment with the City of Westland and the Westland Police Department, Defendants, through their employees, agents, and representatives, intentionally discriminated against Sgt. Buckley in the terms and condition of employment based on unlawful consideration of his disabilities.

273.  During Sgt. Buckley's employment with the City of Westland and the Westland Police Department, Defendants, through their employees, agents, and representatives, treated Sgt. Buckley differently from similarly-situated non-disabled employees in the terms and conditions of employment, specifically, and without limitation, in terminating Sgt. Buckley for alleged conduct that should have been alleged against non-disabled officers.

274.  Sgt. Buckley was subjected to disability discrimination by Defendants, by and through their employees, agents, and representatives, said acts being made unlawful by the PDCRA.

44

275. Defendants, by and through their employees, agents, and representatives, violated the PDCRA by the following acts:

a. Failing to provide a work environment free from disability discrimination;

b. Limiting, segregating, or classifying Sgt. Buckley in ways which deprived or tended to deprive Sgt. Buckley of employment opportunities or otherwise adversely affecting the status of Sgt. Buckley because of his disabilities; and

c. Terminating Sgt. Buckley and/or otherwise discriminating against Sgt. Buckley with respect to his employment, compensation, or a term, condition or privilege of employment, because of, in part, his disabilities.

276. Defendants, by and through their employees, agents, and representatives, were predisposed to discriminate on the basis of disability and acted in accordance with that predisposition.

277. Defendants' actions were intentional and with reckless indifference to Sgt. Buckley's rights and sensibilities.

278. If Sgt. Buckley had not been disabled, he would not have been treated in the manner recounted above.

279. As a direct and proximate result of Defendants' wrongful acts and omissions, Plaintiff has sustained loss of earnings, earning capacity, and fringe

benefits and has suffered mental anguish, physical and emotional distress, humiliation and embarrassment.

### COUNT IX
### MALICIOUS PROSECUTION IN VIOLATION OF STATE LAW

280.   Sgt. Buckley realleges and hereby incorporates by reference the allegations contained in the previous and subsequent paragraphs.

281.   As described more fully above, Defendants, all while acting individually, jointly, and in conspiracy, caused Sgt. Buckley to be improperly subjected to judicial proceedings for which there was no probable cause.

282.   The judicial proceedings against Sgt. Buckley were instituted and continued maliciously, resulting in injury to Sgt. Buckley.

283.   All such proceedings were terminated in Sgt. Buckley's favor in a manner indicative of innocence.

284.   Defendants, all while acting individually, jointly, and in conspiracy, accused Sgt. Buckley of criminal activity knowing these accusations to be without probable cause, and they made statements to prosecutors with the intent of exerting influence to institute and continue the judicial proceedings.

285.   Statements of Defendants regarding Sgt. Buckley's alleged culpability were made with knowledge that said statements were false and/or perjured.  In so doing, Defendants fabricated evidence and withheld exculpatory information.

286.   The misconduct described in this Count IX was undertaken with malice, willfulness, and reckless indifference to Sgt. Buckley's rights and sensibilities.

287.   As a direct and proximate result of Defendants' wrongful acts and omissions, Plaintiff has sustained loss of earnings, earning capacity, and fringe benefits and has suffered mental anguish, physical and emotional distress, humiliation and embarrassment.

## COUNT X
## <u>INVASION OF PRIVACY – FALSE LIGHT</u>

288.   Sgt. Buckley realleges and hereby incorporates by reference the allegations contained in the previous and subsequent paragraphs.

289.   Defendants stated to the media and others that the decision to terminate Sgt. Buckley was made after a full internal investigation was complete and had uncovered policy violations by Sgt. Buckley.

290.   Defendants' statement was patently untrue, as the internal investigation had not yet begun at the time Sgt. Buckley was terminated from his position.

291.   Defendants' untrue and misleading statements presented Sgt. Buckley in a false light.

292.   Defendants knew that the statements were false and misleading at the time the statements were made.

293.   Defendants published the remarks to third parties with knowledge of the falsity of the statements or reckless disregard of truth or falsity.

294.   Defendants made the statements in order to prejudice Sgt. Buckley in the conduct of his employment duties and to deter others from working with him.

295.   Defendants also made the statements to deflect attention from their improper and discriminatory actions.

296.   Defendants' false statements resulted in serious damage to Sgt. Buckley's reputation.

297.   As a direct and proximate result of Defendants' wrongful acts and omissions, Plaintiff has sustained loss of earnings, earning capacity, and fringe benefits and has suffered mental anguish, physical and emotional distress, humiliation and embarrassment.

## COUNT XI
## CIVIL CONSPIRACY IN VIOLATION OF STATE LAW

298.   Sgt. Buckley realleges and hereby incorporates by reference the allegations contained in the previous and subsequent paragraphs.

299.   Defendants illegally, maliciously, and wrongfully conspired with one another with the intent to and for the illegal purpose of the above-described conduct.

300.   Defendants, in combination, conspired to wrongfully terminate Sgt. Buckley in violation of his Collective Bargaining Agreement and the policies and procedures of the City of Westland and Westland Police Department.

301.   Defendants, in combination, conspired to terminate Sgt. Buckley in violation of the Elliott-Larsen Civil Rights Act and the Persons With Disabilities Civil Rights Act.

302.   Defendants, in combination, conspired to defame Sgt. Buckley and with willful disregard of Sgt. Buckley's privacy or emotional and financial damage.

303.   The conspiracy resulted in the illegal, unlawful, or tortious activity of discrimination in violation of the Elliott-Larsen Civil Rights Act, discrimination in violation of the Persons With Disabilities Civil Rights Act., invasion of privacy, malicious prosecution and/or intentional infliction of emotional distress.

304.   As a direct and proximate result of Defendants' wrongful acts and omissions, Plaintiff has sustained loss of earnings, earning capacity, and fringe benefits and has suffered mental anguish, physical and emotional distress, humiliation and embarrassment.

## COUNT XII
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

305.   Sgt. Buckley realleges and hereby incorporates by reference the allegations contained in the previous and subsequent paragraphs.

306.   Defendants' conduct as outlined above was intentional.

307.   Defendants' conduct as outlined above was extreme, outrageous, and of such character as not to be tolerated by a civilized society.

308.   Defendants' conduct resulted in severe and serious emotional distress.

49

309.  As a direct and proximate result of Defendants' unlawful actions against Sgt. Buckley, Sgt. Buckley has suffered depression, emotional and physical distress, mental and physical anguish, loss of reputation, humiliation and embarrassment, and the physical effects associated therewith, and will so suffer in the future.

310.  As a direct and proximate result of Defendants' unlawful actions against Sgt. Buckley, Sgt. Buckley's wife and children have also suffered depression, emotional and physical distress, mental and physical anguish, loss of reputation, humiliation and embarrassment, and the physical effects associated therewith, and will so suffer in the future.

311.  As a direct and proximate cause of Defendants' unlawful actions against Sgt. Buckley, Sgt. Buckley has been placed in financial distress and has suffered a loss of earnings, benefits, and retirement pay, as well as a loss of and impairment of his earning capacity and ability to work, and will so suffer in the future.

## **RELIEF REQUESTED**

For all the foregoing reasons, Sgt. Buckley demands judgment against Defendants as follows:

a.   Declare that the practices and actions of Defendants are unlawful;

b.   Enjoin Defendants from further acts of discrimination or retaliation;

c.     Award Sgt. Buckley compensatory damages in an amount to be determined as fair and just under the circumstances by the trier of fact including, but not limited to medical expenses, loss of earnings, mental anguish, anxiety, humiliation and embarrassment, violation of Sgt. Buckley's Constitutional, Federal, and State rights, loss of social pleasure and enjoyment, and other damages to be proved;

d.     Award Sgt. Buckley punitive and/or exemplary damages in an amount to be determined as reasonable or just by the trier of fact;

e.     Award Sgt. Buckley reasonable attorney fees, costs, and interest; and

f.     Award such other relief as this Court deems just and proper.


                                   Respectfully submitted,


                                   /s/ Todd F. Flood
                                   Todd F. Flood (P58555)
                                   Rachel K. Wolfe (P79204)
                                   Flood Law PLLC
                                   Attorneys for Sgt. Buckley
                                   155 W. Congress St., Ste. 603
                                   Detroit, MI 48227
                                   Tel: (248) 547-1032
                                   tflood@floodlaw.com
                                   rwolfe@floodlaw.com

                                   Teresa J. Gorman (P61001)
                                   Teresa J. Gorman PLLC
                                   Attorney for Sgt. Buckley
                                   5700 Crooks Road, Suite 200
                                   Troy, MI 48098
                                   Tel: (248) 763-6943
                                   Fax: (248) 689-3268

terigorman@aol.com

Date: May 27, 2020

## **JURY DEMAND**

Plaintiff, by and through his attorneys, Todd F. Flood, Flood Law PLLC, and

Teresa Gorman PLLC, hereby demands a trial by jury on all claims set forth above.


Respectfully submitted,


*/s/ Todd F. Flood*
Todd F. Flood (P58555)
Rachel K. Wolfe (P79204)
Flood Law PLLC
Attorneys for Sgt. Buckley
155 W. Congress St., Ste. 603
Detroit, MI 48227
Tel: (248) 547-1032
tflood@floodlaw.com
rwolfe@floodlaw.com

Teresa J. Gorman (P61001)
Teresa J. Gorman PLLC
Attorney for Sgt. Buckley
5700 Crooks Road, Suite 200
Troy, MI 48098
Tel: (248) 763-6943
Fax: (248) 689-3268
terigorman@aol.com

Date: May 27, 2020